# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **MARY GODSEY KESSLER,** | ) | **Case No. 19-02539-TOM-7** |
| | ) | |
| Debtor. | ) | |

|  |  |  |
|---|---|---|
| **JOHN HAGAN, KATHY SALSER,** | ) | |
| **and HOMEWOOD MORTGAGE,** | ) | |
| | ) | |
| Plaintiffs, | ) | **A.P. No. 19-00069-TOM** |
| **vs.** | ) | |
| | ) | |
| **MARY GODSEY KESSLER,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This adversary proceeding is before the Court on the Motion for Partial Summary Judgment (AP Doc. 41, the "Motion") and supporting Brief (AP Doc. 42, the "MSJ Brief") filed by Kathy Salser, Homewood Mortgage, Inc., and John Hagan, the Plaintiffs; the Brief to Deny Motion for Partial Summary Judgment (AP Doc. 47, the "Debtor's Brief") filed by Mary Kessler, the Debtor/Defendant, and the Reply Brief in Support of Plaintiffs' Motion for Partial Summary Judgment (AP Doc. 45, the "Reply Brief") filed by the Plaintiffs. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984.[1] This is a core proceeding arising

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A), (J), and (O).[2] This Court has considered the pleadings, the arguments of counsel, the exhibits, the testimony, and the law, and finds and concludes as follows:[3]

### FINDINGS OF FACT[4]

The Debtor is a former employee of Plaintiff Homewood Mortgage, Inc. which was owned by Plaintiff Kathy Salser. According to both the Plaintiffs' Complaint (AP Doc. 1) and the Debtor's Answer to Allegations (AP Doc. 5), the Debtor worked with Homewood Mortgage for approximately ten years. The Plaintiffs' Amended Complaint (AP Doc. 9) reflects that the Debtor assisted with loan closings and would earn a commission when the loans closed. The original Complaint indicates that the Debtor stopped working for Homewood Mortgage in October 2014. The Debtor's schedules reflect that at the time she filed her bankruptcy case she was employed in "servicing" at CBM Mortgage and had been employed there for the nine months prior. BK Doc. 1, Schedule I. It is unclear what employment, if any, that the Debtor held in between the time she left Homewood Mortgage and began working for CBM Mortgage.

---

[2] 28 U.S.C. §157(b)(2)(A), (J), and (O) provide as follows:
> (b)(2) Core proceedings include, but are not limited to–
> (A) matters concerning administration of the estate;
> . . . .
> (J) objections to discharges;
> . . . .
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship . . . [.]

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

Prior to the Debtor's bankruptcy filing[5] a dispute arose between the Plaintiffs and the Debtor.[6] The parties litigated their dispute around 2017 in the Circuit Court of Jefferson County, Alabama, which ultimately resulted in the December 13, 2018 entry of an Amended Order[7] by the Circuit Court providing as follows:

1. On Plaintiffs Salser and Homewood Mortgage, Inc.'s breach of contract claim, the Court finds in favor of Salser and Homewood Mortgage, Inc. and against Kessler, and awards Homewood Mortgage Inc. $22,886.93 and $7,552.69 in attorney fees.

2. On Hagan's claim of Kessler's assault and battery, the Court finds in favor of Hagan and against Kessler, and awards Hagan damages in the amount of $500.00. The Court finds against Kessler and in favor of Hagan on Kessler's assault and battery claim.

3. On Kessler's claim regarding unpaid fees, the Court finds in favor of Homewood Mortgage, Inc. and against Kessler. Costs are taxed as paid.

AP Doc. 1-1, at 1-2. The Amended Order was recorded in the Probate Court of Jefferson County, Alabama on December 13, 2018.

The Debtor, acting *pro se*, filed her bankruptcy case on June 25, 2019. According to the Debtor's schedules the only real property she owns is a piece of real estate located at 2800 Abingdon Parkway. The property, which serves as the residence of the Debtor and her husband,

---

[5] It is not clear exactly when the litigation started but the Amended Order from the Circuit Court of Jefferson County introduced into evidence indicates the circuit court case was filed in 2017. AP Doc. 1-1. It appears from the Amended Order that the litigation actually began in the District Court of Jefferson County, Alabama and went to the Circuit Court of Jefferson County on appeal. *Id.* It further appears that the case was again appealed. Attached as an exhibit to the Plaintiffs' original Complaint is a document from the State of Alabama Court of Civil Appeals dated May 21, 2019 entitled "Certificate of Judgment" dismissing the appeal filed by Kessler due to Kessler's failure to file a brief complying with the Alabama Rules of Appellate Procedure. AP Doc. 1-2.

[6] To say that the parties were engaged in a dispute is putting it mildly. It is clear from the Plaintiffs' Motion and the documents filed in support thereof, and from the Debtor's Brief, that the Plaintiffs and Debtor are very much at odds with each other. The Debtor testified in a deposition taken in connection with this adversary proceeding that "you and I both know this is a bogus judgment, and I will fight it." AP Doc. 41-2, at 19. If the Debtor had been hoping that this Court would render a decision on whether the judgment is "bogus," this Court cannot do so even if it were so inclined. "The *Rooker–Feldman* doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'" *Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199, 163 L. Ed. 2d 1059 (2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005)). Since this Court is not re-visiting the underlying state court Amended Order there is no need for an in-depth explanation of the facts leading to the Amended Order.

[7] The parties refer to the Amended Order as a judgment but this Court will use "Amended Order" as it is the actual title of the document.

is owned solely by the Debtor.  The schedules reflect that the property has a value of $350,000 and is purportedly encumbered by two mortgages.  According to Schedule D the first mortgage is with Regions Mortgage (the "Regions Mortgage");[8] it was given in 2000 and secures a debt in the current approximate amount of $237,000.  Also according to Schedule D the second mortgage was given to Saulter Development (the "Saulter Mortgage") in 2000 and secures a debt of $125,000.  A copy of the Saulter Mortgage attached to the Plaintiffs' original Complaint (AP Doc. 1-3)[9] reflects that the Saulter Mortgage was signed on December 28, 1998 and witnessed by Johnny Kessler; however, it was not recorded in the Probate Court of Jefferson County, Alabama, until January 10, 2019.

The Debtor is married to James Kessler who is identified by the Articles of Incorporation of Saulter Development, Inc. (AP Doc. 1-4) as the sole initial director of Saulter Development.  In her deposition taken August 13, 2020 (AP Doc. 41-2, the "Deposition") the Debtor testified that she and Mr. Kessler were not married or even dating at the time the Saulter Mortgage was signed.  At that time, they "knew each other through the mortgage business" and had been friends for a couple of years. *Id.* at 16.  They did not marry until 2002.  She further testified that Johnny Kessler, who witnessed the Saulter Mortgage, is the now-deceased mother of her husband.  According to the Debtor no payments are due on the Saulter Mortgage until such time that she sells her house, and the balance owed does not accrue interest. The Debtor explained that Saulter Development stopped doing business around 20 years ago, and if she were to sell the house the money owed to

---

[8] The Debtor testified in her deposition taken August 13, 2020, that the mortgage was given to Hamilton Mortgage who later sold it to Regions Mortgage.
[9] The Saulter Mortgage document is titled "Mortgage" but in the body of the document several references are made to "this Note."  No separate note has been introduced into evidence by either the Plaintiffs or the Debtor.

Saulter Development "would go to [her husband] because it's a recorded mortgage."[10]   AP Doc.

41-2, at 16.  Upon questioning, she further explained:

> Q.    Okay. Where did you find the note and mortgage that you -- you said y'all came across it somewhere?
> A.    We had it somewhere at home.  And since all of this has been going on, I have not been able to locate it.
> Q.    Okay. So you don't have the original?
> A.    We have -- we're still looking for it. But as of this date, we have not found it.
> Q.    And you understand the importance of having the original note, don't you?
> . . . .
> A.    I understand this copy right here is every bit as good as an original.
> Q.    I'm sorry, ma'am?
> A.    I understand this is every bit as good as an original.
> Q.    And what do you base that on?
> A.    I base that on the fact that, when it is sold, the title company is going to pull it up, and I'm not going to contest it. So it's just as good.
> Q.    Right. And you are not going to contest it because the money goes to your husband; right?
> A.    I'm not going to contest it because the money is owed to my husband.
> Q.    We will go in --
> A.    He built the house. It was his property. I had nothing to do with it.
> Q.    So how did y'all come up with $125,000?
> A.    I really don't know. I know there were two lots involved in the property, and there was a building fee. I don't know exactly.
> Q.    But did any money actually change hands?
> A.    No.

*Id*. at 17.  When asked why the Saulter Mortgage was not recorded until 2020, the Debtor testified

in her Deposition that Mr. Kessler developed back problems soon after he built her house[11] and

had several surgeries; she believes that is one reason he never had it recorded.  According to the

Debtor:

---

[10] In this Court's over 25 years on the bench, having the occasion to review many mortgages and proposals for loan modifications, this Court has rarely, if ever, seen a note and mortgage that does not accrue any interest and does not require any payments until such time that the borrower sells the house.  It is possible that the Debtor may never sell the house at all, in which case Saulter Development presumably never gets paid.  The Debtor testified that she and Mr. Kessler were not married and were not even dating at the time the Mortgage was executed.  The Court finds it interesting that a business would enter into a business deal in which it loaned a significant amount of money, would not profit at all from the deal, and perhaps would never recover the money it loaned, at a time when the principal of the lender and the borrower were just friends.

[11] Saulter Development built the home that the Debtor and Mr. Kessler now reside in, according to the Deposition.

Q.      And -- and so who went down to probate to file this?

A.      I believe he did.

Q.      Okay. Did you go with him?

A.      I did not.

Q.      Did y'all have a discussion about it beforehand?

A.      I'm sure we did, yes.

Q.      And what did y'all discuss?

A.      That we probably needed to go ahead and have that mortgage recorded.

Q.      And what was the -- and so when y'all had this discussion, was there, hey, we need to go and have that mortgage recorded because of -- fill in the blank?

A.      We were moving. We had moved a couple of times, and we found a bunch of paperwork. We realized it had never been recorded, and we took it down there. No other reason. No matter what you want to try to get me to say --

Q.      No.

A.      -- it's not going to happen.

Q.      I just think that's hysterical --

A.      Well, I'm glad you do.

Q.      -- that that's the basis --

A.      Yes.

Q.      -- that it had nothing to do with getting it on record before you filed your mortgage. That's what your testimony is?

A.      Before I filed my mortgage?

Q.      I'm sorry. That had nothing -- that filing this in probate in January of 2019 had nothing to do with the fact that you were about to file bankruptcy?

A.      Nothing. Nothing to do with it.

*Id*. at 15.

The Plaintiffs contend in their MSJ Brief that except for the Debtor's testimony there is no evidence that the Saulter Mortgage existed prior to the time it was recorded, pointing out that when the Debtor refinanced the Regions Mortgage she never disclosed the Saulter Mortgage to the lender.[12]  *See* Uniform Residential Loan Application, AP Doc. 41-9, at 1-6.[13]  It is their argument that "by recording a fraudulent mortgage on her property with Saulter Development" the Debtor

---

[12] Despite the Plaintiffs' arguments the Debtor never offered any evidence that the Saulter Mortgage actually existed prior to the time of its recordation.

[13] The Uniform Residential Loan Application, dated June 25, 2001, reflects that the Debtor owned household goods worth $50,000, a coin collection worth $25,000, and stocks valued at $6,738.  However, the Debtor's schedules filed with her bankruptcy petition indicates that she owns household goods and furnishings worth only $500.  BK Doc. 1, Schedule A/B.  Furthermore, the Debtor states on Schedule A/B that she does not own any "collectibles of value" including "stamp, coin, or baseball card collections" and does not own any publicly or non-publicly traded stocks. Although the Plaintiffs did not raise the issue, the Court finds it noteworthy that the Debtor no longer has these assets valued at over $75,000.

has transferred property in an effort to hinder or defraud the Plaintiffs and as a result should be denied a discharge under Bankruptcy Code § 727(a)(2). AP Doc. 42, at 15.

The Plaintiffs identify two omissions from the Debtor's schedules that they argue should lead to denial of the Debtor's discharge under §727(a)(4). First, the Plaintiffs contend that the Debtor failed to disclose the use of her husband's bank account. The Debtor did not disclose any interest in bank accounts on either Schedule A/B or the Statement of Financial Affairs, and according to her Deposition, her income from her employment is deposited into Mr. Kessler's bank account.[14] During her Deposition she testified that she does not have a checking account at all, and has not had one for the last four or five years. According to the Debtor she stopped having her own account because:

> I just had problems managing it. And it was costing me too much money. So I turned it over to him. . . . I don't think I bounced any checks, but it was just unneeded. . . . At that time it was, like, nine or ten dollars a month just to have it. And I thought, this is ridiculous.

AP Doc. 41-2, at 26.

The Debtor testified that the account into which her income is deposited is owned solely by her husband. She contends she has no interest in the account and that she cannot write checks on the account; if she needs money, her husband gives it to her. According to the Debtor, she left the account off of her schedules because her name is not on the account. She testified in her deposition:

> Q.     Does he have his – does he have his own checking – do y'all have separate checking accounts? Do y'all –
> A.     I do not have a bank account at all.
> Q.     Okay.
> A.     He only has a bank account.

---

[14] The Debtor indicated on Schedule I that she is employed by CBM Mortgage with a gross income of $3,293 per month; however, she represented on her Statement of Financial Affairs that she did not have any income from employment or other sources the year she filed her bankruptcy case or the two calendar years prior to her bankruptcy filing.

7

| Q. | All right.  Do you have – can you write checks on that? |
|---|---|
| A. | I cannot. |
| Q. | Do you write checks and sign his name? |
| A. | I do not. |
| Q. | So you have never a single time written a check and signed his name – |
| A. | No. |
| Q. | – to pay a bill or anything? |
| A. | No. |

AP Doc. 41-2, at 9.  Despite the Debtor's testimony that she cannot write checks, and did not write checks, on her husband's account, the Plaintiffs introduced into evidence four checks written from an account owned by James A. Kessler[15] at Regions Bank.  AP Doc. 41-6, at 7-10.  All four checks were signed by Mary Kessler.[16]

The Plaintiffs also contend that the Debtor did not disclose her ownership of two pieces of real property located in Mississippi.  The Debtor testified that her grandmother had owned the Mississippi lots, and upon her grandmother's death, ownership of the lots went to her grandmother's children; because the Debtor's mother was deceased at that time, she and her two sisters received the ownership share in the lots that would have otherwise gone to their mother.  The Debtor further testified that by way of a deed recorded on June 30, 1998, her aunts, uncles, and two sisters transferred ownership of the lots to her, and that she gave it to her nieces about 10-15 years ago.  The Debtor asserted that she thinks that she signed a deed but that she could not produce the deed "[b]ecause the basement flooded."  AP Doc. 41-2, at 35.  Although the Debtor contended in her Deposition that she no longer owned the lots, she admitted that the tax appraisals for the two lots still reflect that she is the owner.  She testified that her nieces knew that she had

---

[15] The checks themselves contain the name "James A. Kessler" and the address of the Debtor and her husband printed in the top left-hand corner.

[16] The checks introduced into evidence were signed by the Debtor in her own name; thus, the Debtor's testimony that she never signed her husband's name to his checks was technically accurate, at least as far as the evidence presented to this Court goes.  However, the Debtor's answer that she could not write checks on the account is not consistent with the fact that she did, indeed, write checks on the account.

given the lots to them and would testify themselves that they knew of the gift. Despite that, submitted as an exhibit to the Plaintiffs' Motion, is a declaration (AP Doc. 41-8, the "Declaration") of April Counts, the Debtor's niece. In the Declaration, Ms. Counts advises that the Debtor has neither gifted nor deeded any property to her, and that according to her mother, her mother has not received any lots from the Debtor either.

The Debtor's explanation regarding the transfer of the lots in her responses to the Plaintiff's discovery requests differs from her testimony at her Deposition. In her responses to the Plaintiffs' Interrogatories (AP Doc. 41-3) she explained that "I transferred ownership of both lots to my sister, she has since died. She was supposed to have transferred to her children and my other niece. Why she didn't I don't know." AP Doc. 41-3, at 28. As a response to a question in the Interrogatories as to why the lots were still in her name if they had been transferred she stated "[m]y sister got sick and I guess she never got around to it." *Id*. at 29. Another question in the Interrogatories asked the Debtor why she continued to pay the taxes on the Mississippi lots if she had transferred ownership; she did not directly answer the question, but responded that "[y]ears ago, I tried to sell the lots. The Real Estate agent had no luck and told me she had been offered $500 for each lot. I didn't see any reason to sell at that point and gave them to my nieces and nephew." *Id*.

During her Deposition the Debtor explained the reason for her bankruptcy filing:

Q.      Would you agree with me – agree with me that the primary reason you filed this bankruptcy was to avoid paying that underlying state court judgment?
A.      You are going to have to say that again.
Q.      Sure. Would you agree with me that the – that the primary reason you filed this Chapter 7 bankruptcy was to discharge the underlying state court debt?
A.      State court?
Q.      Yes, state court judgment, the judgment.
A.      Yes, I filed the bankruptcy because I didn't want to pay a judgment that I felt was wrong.
 . . . .
A.      . . . I will be 62 in a couple of months and intend to retire. You cannot garnish my social security earnings, and I don't intend to sell my house. So go

9

ahead and spend whatever you think you need, but you and I both know this is a bogus judgment and I will fight it.

AP Doc. 41-2, at 13, 19. With regard to preparing and filing the case, the Debtor testified in her Deposition:

> Q.      All right. Let's look at the voluntary petition for a minute, which is Exhibit 2. And you understood that when you filed this petition that you signed it and you swore that the contents of it were true and correct under oath; right?
> A.      Yes.
> . . . .
> Q.      And you read this oath that you took and what you were swearing to before you signed it?
> A.      Probably not.
> Q.      Do you typically not read the documents that you sign?
> A.      No, I usually don't. They are too long. And they are usually a bunch of junk. And so, no, I probably did not read it.
> Q.      You don't know, though, whether you read it or not?
> A.      I'm just going to say I did not read it.

*Id*. at 6.

In the Debtor's Brief, she focuses primarily on the facts underlying the state court Amended Order, as well as allegations of criminal activity on the part of one of the Plaintiffs. The Debtor explains that she gave the Mississippi lots to her sister[17] who died before the sister could give them to her children. In addition, the Debtor asserts that the lots are worth only $500 each, although she does not explain the relevance of the valuation. She argues that summary judgment should not be granted for the Plaintiffs because (i) the underlying judgment is based on a forged promissory note, (ii) her home "has already been granted approval for reaffirmation," (iii) she had no fraudulent intent, (iv) counsel for the Plaintiffs has contacted her employer regarding garnishing her wages, said he will force her to sell her house, and said that he would add his costs to the judgment amount even though he is currently working *pro bono*; (v) she and her husband both have health issues,

---

[17] The Debtor did not produce a deed transferring ownership of the Mississippi lots to her sister.

and (vi) one of the Plaintiffs is a "con woman." AP Doc. 47. The Debtor relies only on her assertions in her Brief and has submitted no evidence to support her position.

## <u>CONCLUSIONS OF LAW</u>

The Complaint alleged counts seeking to deny the Debtor a discharge under § 727 and counts to have the debts owed to the Plaintiffs declared nondischargeable under § 523. However, the Plaintiffs are seeking a partial summary judgment only as to the counts for denial of the Debtor's discharge.

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, made applicable in adversary proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure. Rule 56 provides in relevant part:

> A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56. The party moving for summary judgment has the burden of demonstrating the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 – 23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "'[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Chapman v. Al Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); see also *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1986). Once the moving party has satisfied its burden of proof by proving the absence of a genuine issue of material fact and that it is entitled to judgment

11

as a matter of law, the burden shifts to the non-moving party to offer evidence of specific facts which prove the existence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993).

The Plaintiffs seek a partial summary judgment on their counts under § 727 to deny the Debtor's discharge. They allege counts under §§ 727(a)(2), (a)(4), and (a)(7).

> Given its importance, actions to deny a discharge are construed strictly against the complaining party and liberally in favor of the debtor. *Rutland v. Petersen (In re Petersen)*, 323 B.R. 512, 516 (Bankr. N.D. Fla. 2005). A creditor seeking to deny a debtor's discharge bears the burden of proof as to each element by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *Grogan [v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L. Ed. 2d 755 (1991)]. However, once a creditor meets this initial burden, the burden shifts to the debtor to show by a preponderance of the evidence that he or she is entitled to a discharge. *Crews v. Stevens (In re Stevens)*, 250 B.R. 750, 755 (Bankr. M.D. Fla. 2000). Thus, the debtor has the ultimate burden of persuasion, demonstrating that he or she is entitled to a discharge despite the evidence presented by the objecting party. *Posillico v. Bratcher (In re Bratcher)*, 289 B.R. 205, 217 (Bankr. M.D. Fla. 2003); *Law Offices of Dominic J. Salfi, P.A. v. Prevatt (In re Prevatt)*, 261 B.R. 54, 58 (Bankr. M.D. Fla. 2000).

*Morrissey v. Dereve (In re Dereve)*, 381 B.R. 309, 324 (Bankr. N.D. Fla. 2007).

The Plaintiffs allege that the Debtor should be denied a discharge pursuant to Bankruptcy Code § 727(a)(2) due to her transfers and concealment of assets, pursuant to § 727(a)(4) for making false oaths and misrepresentations on her bankruptcy schedules, and pursuant to § 727(a)(7) for dealing with an insider within the one-year period prior to the filing date.

## Section 727(a)(2)

Section 727(a)(2) provides:

> (a) The court shall grant the debtor a discharge, unless—
> . . . .
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

12

(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. §727(a)(2). To be successful under § 727(a)(2), a plaintiff must establish "(i) a transfer or concealment of property of the debtor or estate, (ii) improper intent, and (iii) an improper act that occurred either during the one year preceding the filing or postpetition." *Eastern Diversified Distrib., Inc. v. Matus (In re Matus)*, 303 B.R. 660, 672 (Bankr. N.D. Ga. 2004). As "transfer" is not defined in § 727, at least one court has looked to the definition set forth in Bankruptcy Code § 101(54), which provides:

(54) The term "transfer" means--
(A) the creation of a lien;
(B) the retention of title as a security interest;
(C) the foreclosure of a debtor's equity of redemption; or
(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with--
(i) property; or
(ii) an interest in property.

11 U.S.C. § 101(54), quoted in *Gebhardt v. McKeever (In re McKeever)*, 550 B.R. 623, 635 (Bankr. N.D. Ga. 2016). "The term "transfer" under § 727(a)(2) and § 101(54) is to be broadly construed. 'The definition of transfer is as broad as possible ... [A] deposit in a bank account or similar account is a transfer.'" *Cain v. Shingledecker (In re Shingledecker)*, 242 B.R. 80, (Bankr. S.D. Fla. 1999) (quoting *In re Levine*, 134 F.3d 1046, 1049 (11th Cir. 1998)). *See also Dereve*, 381 B.R. at 326; *James v. Tipler (In re Tipler)*, 360 B.R. 333, 341 (Bankr. N.D. Fla. 2005). "Under this broad definition of transfer, even a disposition of possession, custody, or control could qualify as a transfer." *McKeever*, 550 B.R. at 635.

Concealment has been explained as "includ[ing] physical hiding of the property, and 'other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failing or refusing to divulge owed information.'" *McKeever*, 550 B.R. at 636 (quoting

13

6 *Collier on Bankruptcy* ¶ 727.02[6][a] (Richard Levin & Henry J. Sommer eds., 16th ed.)). "The attempt of a debtor to decrease the apparent value of equity in a property by overstating a secured claim is a sufficient ground for denial of discharge." 6 *Collier on Bankruptcy* ¶ 727.04[2] (Richard Levin & Henry J. Sommer eds., 16th ed.) (footnotes omitted) [hereinafter *Collier*]. Concealment may also include situations where assets are put in the name of a spouse in order to keep the assets shielded from creditors. *See Collier* ¶ 727.02 (citing *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1316 (11th Cir. 2009)).

Since an admission of intent is unlikely, circumstantial evidence or inferences drawn from the facts and circumstances of the case my supply the requisite actual intent. *James v. Tipler (In re Tipler)*, 360 B.R. 333, 340 (Bankr. N.D. Fla. 2005); *see also Gargula v. Wright (In re Wright)*, 618 B.R. 569, 583 (Bankr. M.D. Fla. 2020). "Badges of fraud" have been useful to courts in analyzing a debtor's intent and may include:

> 1. Whether the transfer was to an insider, such as a family member or close friend;
> 2. The retention of possession, control, benefit, or use of the property by the debtor;
> 3. The secrecy of the transfer;
> 4. Whether the transfer was made after the debtor was sued, threatened with a suit; incurred substantial debt, or met with financial hardship;
> 5. Did the transfer include all or a substantial portion of the debtor's property;
> 6. The lack of adequate compensation that is reasonably equivalent to the value of the property;
> 7. The financial condition of the party charged prior to and after the transaction- was the party insolvent prior to the transfer or did the party become insolvent as a result of the transfer?

*DePaola v. Dorsey (In re Dorsey)*, Bankruptcy No. 09-11157-WRS, Adversary No. 10-1066-WRS, 2011 WL 2313158, at *13 (Bankr. M.D. Ala. June 8, 2011) (Sawyer, J.). Although evidence of a pattern of transfers or omissions makes a stronger case for the requisite intent, a single transfer

14

or omission may suffice. *Matus*, 303 B.R. at 672 (citing *Royer v. Smith (In re Smith)*, 278 B.R. 253, 258 (Bankr. M.D. Ga. 2001)).

Under certain circumstances, the execution or recording of a mortgage by a debtor has supported the denial of the debtor's discharge under § 727(a)(2). In *Marine Midland Bank, N.A. v. Mollon*, the debtors gave a third mortgage on their residence to relatives at a time when the debtors owed a large deficiency balance to a creditor. *Mollon*, 160 B.R. 860, 861 (M.D. Fla. 1993). The day after the debtors gave the mortgage, they were served with the creditor's suit to recover the deficiency balance. *Id*. at 861. Within two weeks the debtors signed a contract to purchase a residence in Florida primarily using the cash proceeds, and the day following that, consulted a bankruptcy attorney. *Id*. at 862. The debtors filed their bankruptcy case a little over one month from learning that the creditor had recorded a deficiency judgment against them. *Id*. at 863. The third mortgage was not disclosed on the debtors' bankruptcy schedules as a transfer made within one year of the bankruptcy filing. *Id*. Determining that the debtor-husband had acted with fraudulent intent when he converted his nonexempt assets, the bankruptcy court denied the debtor's discharge. *Id*. On appeal,[18] the district court noted:

> The bankruptcy court determined that [the debtor] was aware that he had equity in property that would otherwise be available to creditors unless he found a way to transfer and protect it. (B.R. at p. 249). As evidence of [the debtor's] fraudulent intent, the bankruptcy court noted that: (1) the [debtors] obtained the third mortgage from a corporation controlled by a family member; (2) the transaction was designed so as not to put the family member at risk of loss; (3) the amount of money involved was significant; and (4) the omission of the transaction from the bankruptcy Schedules was significant. (B.R. at p. 251).

*Id*.

---

[18] The question before the district court was not whether the bankruptcy court correctly determined that the debtor-husband's discharge was due to be denied, but whether the debtor-wife's discharge should have been denied as well. *Id*. at 860-61. The district court found that the debtor-wife acted in the same manner as her husband and thus her discharge was denied. *Id*. at 865, 870.

15

With regard to the Mortgage, the Debtor transferred or concealed the equity in her home in an effort to put it out of the reach of the Plaintiffs. Reminiscent of *Mollon*, wherein the debtors gave a third mortgage to relatives immediately before being served with a creditor's lawsuit and filed their bankruptcy case soon after a judgment against them had been recorded, this Court's Debtor recorded the Saulter Mortgage, with the mortgagee in effect being her husband as Saulter Development was no longer in business and had been out of business for over 20 years, only after the Plaintiffs recorded the Amended Order issued by the Circuit Court of Jefferson County, Alabama. *See also Lister v. Gonzalez (In re Gonzalez)*, 92 B.R. 960 (Bankr. S.D. Fla. 1988) (mortgage given to creditor and later recorded within one year of the debtors' bankruptcy filing was a factor in denial of the debtors' discharge under § 727(a)(2)(A)).

The Debtor's recordation of the Saulter Mortgage also represents badges of fraud with regard to her intent. The Debtor testified that the Saulter Mortgage was given to Saulter Development when she purchased the home, at a time when she and her now-husband were not married. However, at the time of recording Saulter Development was no longer in business (and had been out of business for 20 years) and payment on the Mortgage would go her husband, an insider. Such payment to her husband would also benefit the Debtor as it would be deposited into an account into which the Debtor's income is also deposited. She stated that she found the Saulter Mortgage when moving and realized that it had never been recorded; thus, she had it recorded. By the time the Saulter Mortgage was recorded an Amended Order giving the Plaintiffs monetary awards against the Debtor had already been issued and recorded. [19]

---

[19] To reiterate, the Debtor's testimony is that years ago Saulter Development made a loan to her, a friend of its principal, and the loan accrues no interest and requires no payments until such time that she sells the house that serves as collateral for the mortgage securing the loan. Further, it is the Debtor's testimony that the mortgage was not recorded at the time the loan was made but was recently discovered and recorded; upon sale of the house, since Saulter Development is no longer in business, payment would go to its principal, who is now her husband and resides in the house with her. The Court finds it curious that Saulter Development would make a loan with such favorable terms to someone who is simply a friend, fail to record the mortgage, then happen to find and record the

Case 19-00069-TOM    Doc 50    Filed 06/14/21    Entered 06/14/21 14:12:45    Desc Main
Document      Page 16 of 25

The Plaintiffs contend there is no evidence that the Saulter Mortgage previously existed as she did not disclose it on the Uniform Residential Loan Application at the time she refinanced the home in 2001. Only one witness signed the Saulter Mortgage – the Debtor's husband's mother, who is now deceased – and there is no one who can authenticate the document.[20]

However, whether or not the Saulter Mortgage has existed for years or merely months before the Debtor's bankruptcy filing ultimately makes no difference. *Collier on Bankruptcy* addresses situations where a transfer was made more than one year preceding a debtor's bankruptcy filing but the transfer was not made of record until the debtor was within the one-year statutory period; while the analysis looks to law pertaining to fraudulent transfers under § 548, *Collier on Bankruptcy* makes clear that the analysis is relevant to § 727(a)(2):

> There is a split of authority over whether a debtor should be denied a discharge if the transfer itself was made before, but the record of the transfer was made within, the statutory period. Section 548 deals with fraudulent transfers, and section 548(d) provides that for purposes of section 548, a transfer occurs when it is perfected against a bona fide purchaser. If that timing provision is applied to the fraudulent transfer ground for objecting to discharge, recordation within the statutory period would be sufficient to sustain an objection to discharge. This would avoid any controversy over exactly when the transfer occurred, since the date of recordation is a matter of public record. It would also prevent a debtor from concealing the transfer by delaying recordation to avoid the operation of section 727(a)(2). Under this approach, a further question would arise over whether the debtor's intent should be measured at the time of the act or at the time of recordation. Under section 548(d), intent is measured at the time of recordation and that seems appropriate under section 727(a)(2) as well.

*Collier* ¶ 727.02 (footnotes omitted). *See also Young Contracting Co., Inc. v. Roy (In re Roy)*, 42 B.R. 102 (Bankr. S.D. Fla. 1984).

---

mortgage at a time when the friends have become husband and wife, the wife (the Debtor) is liable for a sizeable debt owed to the Plaintiffs, and the wife would file her bankruptcy petition shortly thereafter.

[20] In Alabama, mortgages may be, but are not required to be, notarized; only the signature of one witness is necessary. Ala. Code §§ 35-4-20 and 35-4-23.

By recording the Saulter Mortgage, the Debtor concealed equity in her home by attempting to place the equity out of reach of her creditors.[21] The Debtor, who has years of experience working in the mortgage industry, knew or should have known the importance of recording a mortgage soon after its execution. Also, with her experience, the Debtor knew or should have known that a purported mortgage secured by real estate would reduce any equity that would have otherwise been available to her creditors. No less significant is the fact that her husband, prior to developing health issues, had worked in the building industry. He also would have or should have known the importance of immediately recording mortgages, especially since the recordation of a mortgage would help protect his entitlement to repayment when he financed a purchase, as the Debtor claims he (or his company Saulter Development) did for her. The Debtor's intent to hinder, delay, or defraud her creditors is clear upon consideration of her actions prior to filing this bankruptcy case. Perhaps the most significant indicator of the Debtor's intent to hinder, delay or defraud her creditors can be found in the Debtor's own words where she admitted in her deposition that "[y]es, I filed the bankruptcy because I didn't want to pay a judgment that I felt was wrong," and further:

> I will be 62 in a couple of months and I intend to retire. You cannot garnish my social security earnings, and I don't intend to sell my house. So go ahead and spend whatever you think you need, but you and I both know this is a bogus judgment, and I will fight it.

---

[21] Although it is not at issue in this adversary proceeding which deals only with denial of the Debtor's discharge and dischargeability of debts, it is possible that the recordation of the Saulter Mortgage may not have made any difference as to the debt owed to the Plaintiffs. Under Alabama law:

> A deed that is unrecorded is good between the grantor and grantee, but is void against bona fide purchasers for value, mortgagees, and judgment creditors without notice. *Alexander v. Fountain*, 195 Ala. 3, 70 So. 669 (1916). Therefore, if a judgment creditor without notice perfects a lien against the property, he is protected against subsequently recorded instruments, regardless of the date of execution or delivery of those other instruments. *Johnson v. Haleyville Mobile Home Supply, Inc.*, 477 So. 2d 328 (Ala.1985).

*Smith v. Arrow Transp. Co.*, 571 So. 2d 1003, 1006 (Ala. 1990). *See also* Ala. Code § 34-4-90; Robert L. McCurley, Jr., Real Estate Handbook: Land Laws of Alabama § 34-2 (10th ed. 2020). This Court makes no determination as to the Plaintiffs' lien-priority rights under Alabama law.

AP Doc. 41-2, at 19. The Plaintiffs have established there is no genuine issue of material fact that the Debtor's actions and intent satisfy the elements of § 727(a)(2) and thus the Debtor's discharge is due to be denied under § 727(a)(2).

**Section 727(a)(4)**

Section 727(a)(4)(A) provides:

> (a) The court shall grant the debtor a discharge, unless—
> . . . .
>     (4) the debtor knowingly and fraudulently, in or in connection with the case--
>         (A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A). In the MSJ Brief, the Plaintiffs argue that the Debtor has made false oaths and material representations that are sufficient for a denial of her discharge under § 727(a)(4). Although they do not specify the subsection under which they seek denial of the Debtor's discharge, their allegations indicate that they are relying under § 727(a)(4)(A). To be successful, the Plaintiffs must prove "(1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Dereve*, 381 B.R. at 334.

For the purposes of § 727(a)(4)(A), a debtor's schedules constitute an oath. *In re Grondin*, 232 B.R. 274, 276 (1st Cir. B.A.P. 1999) ("A debtor's Schedules . . . are unsworn declarations made under penalty of perjury and are, according to federal law, the equivalent of a verification under oath"). "Deliberate omissions from schedules or the statement of financial affairs may also constitute false oaths or accounts." *Dereve*, 381 B.R. at 334 (citing *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)). "Omission of property from verified schedules may be both a false oath and a concealment. It is not only omissions of property from schedules that may constitute false oaths: included also are

19

false statements about books, papers and deeds, and facts about the debtor's ownership of property." *Collier* ¶ 727.04.

"When a debtor omits important information and does not make a full disclosure, the debtor places his right to discharge in serious jeopardy." *SunTrust Bank v. Mitchell (In re Mitchell)*, 496 B.R. 625, 632 (Bankr. N.D. Fla. 2013). The need for accurate disclosure in the schedules is fairly simple, as creditors should not have to dig and independently investigate a debtor's affairs in order to get the facts; thus, a debtor does not get to decide what information is relevant and should be disclosed. *See Dereve*, 381 B.R. at 335 (citations omitted). "[T]he debtor's assertions that the assets are worthless or unavailable to creditors does not relieve the debtor from disclosing all his property interests and transfers of same." *Roy v. Watkins (In re Watkins)*, 84 B.R. 246, 250 (Bankr. S.D. Fla. 1988).

Fraudulent intent "refers to the misrepresenter's knowledge of the untrue character of his or her representations." *In re Digital Res., LLC*, 246 B.R. 357, 367 (8th Cir. B.A.P. 2000). "Fraudulent intent is, in essence, dishonesty or bad faith." *Id*. "Fraudulent intent has also been characterized as intent to 'deceive' or 'mislead.'" *Id*. (quoting *M.H. v. Caritas Family Servs.* 488 N.W.2d 282, 289 (Minn.1992)). "Because debtors generally will not testify as to their own misconduct, that a false oath was made knowingly and fraudulently is generally proven by circumstantial evidence or inferences drawn from circumstances surrounding the debtor." *Mitchell*, 496 B.R. at 640 (citing *Phillips v. Epic Aviation (In re Phillips)*, 476 Fed. App'x 813, 816 n.1 (11th Cir. 2012)). "While an isolated omission may be attributed to oversight, a pattern of omissions clearly warrants the conclusion that the omissions from the SOFA and the schedules were made with the requisite fraudulent intent." *Dereve*, 381 B.R. at 335 (citing *Heidkamp v. Grew (In re Grew)*, 310 B.R. 445, 451 (Bankr. M.D. Fla. 2004).

20

"The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik*, 748 F.2d at 618 (citing *In re Steiker*, 380 F.2d 765, 768 (3d Cir. 1967)).

Failure to disclose the use of a bank account in someone else's name has contributed to the denial of discharge pursuant to § 727(a)(4)(A). In *Agai v. Antoniou (In re Antoniou)*, although the debtor's schedules reflected that he had no interests in bank accounts, he later admitted that his income was deposited into a bank account owned by his non-debtor wife and from that account his household expenses and debts were paid. *Agai v. Antoniou (In re Antoniou)*, 515 B.R. 9, 14-15, 23 (Bankr. E.D.N.Y. 2014). The court determined that "[t]he Debtor did have an interest in that account and yet failed to disclose it on his petition and schedules." *Id*. at 23. However, even if the court had determined the debtor did not have an interest in the account, he nonetheless made a false oath:

> If it is assumed that the Debtor did not have an interest in the Bank Account, and that the Bank Account belonged exclusively to his wife, then the Debtor made a false oath by failing to disclose the transfers of his earnings to the Bank Account. The Statement of Financial Affairs requires the Debtor to list all payments made to creditors who were insiders within one year of the Filing Date; to list all gifts made within one year before the Filing Date; and to list all other property transferred within two years before the Filing Date. The deposit of his Centex paychecks and of the proceeds of his Zeus Construction paychecks in the Bank Account would certainly fall into one or more of these categories; yet the Debtor responded "none" to all of these questions.

*Id*. Finding that the debtor made a false oath or omission regarding the bank account which was disclosed only as a result of discovery, that the false oath or omission was material as it related to the discovery of his assets and the "disposition of his property," and that the debtor acted with fraudulent intent since he knew that his money was deposited into his wife's account, the court concluded that the plaintiff had made a prima facie case under § 727(a)(4) that was not rebutted

21

by the debtor. *Id*. at 23-25. The debtor's discharge was denied pursuant to §727(a)(4).[22] *Id*. at 26.

A bankruptcy court in the Northern District of Florida recently granted summary judgment in favor of the trustee and denied a debtor's discharge under § 727(a)(4)(A) when the debtor failed to disclose his transfer of an interest in real property as well as failed to disclose that his income was deposited into a bank account owned by his wife. *Venn v. Boyd (In re Boyd)*, BK No. 18-30220-KKS, AP No. 18-03012-HAC, at 4, 6-7 (Bankr. N.D. Fla. Sept. 11, 2019). These omitted transfers were made despite creditors holding judgments against him.[23] *Id*. at 6. The court concluded that the omissions were false statements material to the case, made with fraudulent intent as evidenced by the pattern of omissions. *Id*. Since the trustee "produced credible evidence establishing the elements of his § 727(a)(4) claim," and the debtor provided no "evidence to raise a genuine issue of material fact," the court granted summary judgment in favor of the trustee as to the § 727(a)(4) claim. *Id*. at 7.

Here, the Plaintiffs have identified at least two omissions from the Debtor's schedules that they assert qualify as false statements under § 727(a)(4). One omission is the Debtor's failure to disclose her interest in the Mississippi properties. The Debtor admits that the Mississippi lots were omitted from her schedules, explaining that ownership of the lots was transferred to her nieces years ago. The evidence, however, does not support the Debtor's claim. Property records from Jackson County, Mississippi indicate that the Debtor owns the properties and that she has paid the property taxes, a fact to which she admits in her answers to the Plaintiffs' Interrogatories. She admits in her responses to the Plaintiff's Requests for Admissions that neither of her nieces, the

---

[22] In addition to not including the bank account in his schedules, the debtor also understated his income, and attributed some of his income to his spouse, on the Statement of Financial Affairs. *Antoniou*, 515 B.R. at 23-25.

[23] It appears that the debtor did not disclose the judgments in his schedules either. *Boyd*, BK No. 18-30220-KKS, AP No. 18-03012-HAC, at 6.

purported transferees, would confirm that the lots were transferred to them and in fact one signed a declaration affirming that that she has not received ownership of any lots in Mississippi from the Debtor. Additionally, the Debtor's deposition testimony and answers to the Interrogatories are inconsistent, in that she testified that she gave the lots to her nieces, yet explained in her answers to the Interrogatories that she transferred ownership to her now-deceased sister who was supposed to have transferred the lots to her nieces but apparently did not. Regardless, she has no documentary evidence for either scenario. The Debtor asserts in her Brief that the Mississippi lots are worth only $500 each. While she does not explain to the Court the importance of this bit of information, to the extent that the Debtor is attempting to excuse the omission of the lots from her schedules, any such attempt fails. The value of the lots has no bearing on her obligation to make full disclosure because debtors have no discretion to decide what is, and is not, relevant information that should be disclosed.

Another omission is the Debtor's use of her husband's bank account. The Debtor testified in her deposition that she did not disclose the account on her schedules because she does not own it, but admitted that all of her income is deposited into that account and her debts are paid through the account. Furthermore, the fact that she did write checks on the account indicates that she used the account as her own. As in *Antoniou* and *Boyd*, the Debtor's use of the bank account is sufficient that it should have been disclosed on her schedules; alternatively, the Debtor should have disclosed the transfers of her income to her husband via deposit into his account. By doing neither, the Debtor made a false statement under oath for purposes of § 727(a)(4)(A).

Circumstantial evidence establishes that the Debtor acted knowingly and with fraudulent intent in failing to disclose her ownership of the Mississippi property as she admittedly paid taxes on the Mississippi property well past the time of the alleged transfers. The Debtor's non-disclosure

23

of her use of her husband's bank account is no different from the non-disclosures in *Antoniou* and *Boyd* wherein the courts found the requisite knowing and fraudulent intent. In addition, the Debtor's fraudulent intent is further established by her pattern of omissions. The Plaintiffs have established that there is no genuine issue of material fact that the Debtor's discharge is due to be denied under § 727(a)(4)(A).

**Section 727(a)(7)**

Section 727(a)(7) provides:

(a) The court shall grant the debtor a discharge, unless—
. . . .
(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider[.]

11 U.S.C. § 727(a)(7). As broken down by *Collier on Bankruptcy*:

Section 727(a)(7) denies a discharge to a debtor who:
(1) on or within one year before the date of the filing of the petition, or at any time during the debtor's own case,
(2) commits any of the objectionable acts specified in subsection 727(a)(2), (3), (4), (5) or (6),
(3) in connection with *another* case concerning an *insider*.

*Collier* ¶ 727.10. None of the allegations raised by the Plaintiffs concern any other bankruptcy case; thus, this subsection is inapplicable and the Debtor's discharge is not due to be denied pursuant to Bankruptcy Code § 727(a)(7).

## CONCLUSION

It is important to note in this adversary proceeding that the Debtor, who has apparently worked in the mortgage industry for many years, is not the typical debtor before this Court with regard to knowing the ins and outs of real estate, especially when it comes to ownership, purchasing, mortgaging, and selling or gifting. Someone with several years of experience in real

24

estate, particularly with experience in loan closings, would know or should know the importance of recording a mortgage as soon as possible in order to protect the priority of the mortgagee's lien. Further, such a person would know or should know that the transfer of ownership of real estate must be accomplished by deed, and that the deed should be recorded to provide notice of the ownership to others.

The Plaintiffs have established that there is no genuine issue of material fact regarding either (i) whether the Debtor transferred or concealed property, within one year of the filing date, with the intent to hinder or delay the Plaintiffs from collecting on the sums awarded to them in the Amended Order; or (ii) whether the Debtor knowingly and fraudulently made false oaths in her bankruptcy case. The Debtor has not presented any evidence that would raise a genuine issue of material fact. Thus, the Plaintiffs are entitled summary judgment on their counts to deny the Debtor's discharge under §§ 727(a)(2) and 727(a)(4)(A). It is therefore

**ORDERED, ADJUDGED, and DECREED** that Plaintiffs' Motion for Partial Summary Judgment is **GRANTED** to the extent they seek denial of the Debtor's discharge pursuant to Bankruptcy Code §§ 727(a)(2) and 727(a)(4)(A). A separate order and judgement consistent with this Memorandum Opinion shall be entered.

Dated: June 14, 2021

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm